CLERK'S OFFICE
A TRUE COPY
Nov 29, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )    Case No.    23    MJ    230
)
Records and information associated with the )
cellular device assigned number (414) 460-5121 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the     Eastern     District of     Wisconsin    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846; and 843(b) | Distribution and possession with the intent to distribute controlled substances; Conspiracy to possess with the intent to distribute controlled substances; and Illegal use of a communication facility. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Richard Klarkowski, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: __11/29/2023__

_____
*Judge's signature*

City and state: Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Richard Klarkowski, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND BACKGROUND**</u>

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c) to authorize law enforcement to employ electronic investigative techniques, as described in the following attachment, to determine the location of the target cellular device assigned dialed number (414) 460-5121, referred to in this affidavit as the "Target Cellular Device." The service provider for the target cellular device is T-Mobile, a wireless telephone service provider ("Service Provider") headquartered at 4 Sylvan Way, Parsippany NJ, 07054. This affidavit is made in support of up to two different search warrants to locate the phone: 1) by obtaining information from the service provider, e.g., cell site and other precision location information and/or 2) by utilizing a device that acts as a cell phone tower sometimes referred to as a Cell Site Simulator or Wi-Fi geolocation device. In addition, because this request may be construed as a Pen Register / Trap and Trace device or request, the application for this warrant (which includes this affidavit) is intended to comply with 18 U.S.C. § 3122.

2.      I am employed with the Milwaukee Police Department as a full time sworn police officer for approximately 11 years.  I am currently assigned as a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) Milwaukee Area Safe Streets Task Force (MASSTF). I have investigated violations of Federal law, directed drug investigations, obtained and executed search and arrest warrants related to the distribution of illegal narcotics and illegal firearm

1

possession, and debriefed confidential informants and cooperating defendants. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests. I have experience in the investigation, apprehension and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

3.      The facts in this affidavit come from my personal observations, training, experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      There is reason to believe the target cellular device is currently located in this district. The user lives in and is known to spend most of his time in the Eastern District of Wisconsin.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that Cain Botello Jr. ("Botello Jr.") is using the Target Cellular Device. I know from training and experience that cell phone users normally have their cell telephones with them, so locating a user's cell phone will show that user's location. I believe that locating the Target Cellular Device will constitute and lead to evidence of federal offenses, namely violations of 21 United States Code §§ 841(a)(1) (distribution and possession with the intent to distribute controlled substances), 846 (conspiracy to distribute and possess with the intent to distribute controlled substances), and 843(b) (illegal use of a communication facility) committed by Cain Botello Jr.

2

**PROBABLE CAUSE**

6.     In March 2021, the Milwaukee Police Department received information from an anonymous tip that Botello Jr. was selling marijuana and pills. The anonymous tip stated that Botello Jr. was storing drugs and guns at the address of 1118 S. 35th Street, which is a residence belonging to his father, Botello Sr., and his uncle, Victoriano Botello Jr. ("Victoriano"), as well as the address of 1510 S. 36th Street, which belonged to the mother of Botello Jr.'s child (Perla Y. Perez-Jimenez). The anonymous tip stated that Botello Jr. had a Dodge Charger Hellcat edition that he reported stolen, but the anonymous tipster believes Botello Jr. committed insurance fraud. The anonymous tipster stated that Botello Jr. used the money claimed from insurance, as well as money from his drug proceeds, to fund his clothing line company called "Turn Around Gang" clothing. MASSTF was able to identify the address of 285 N. Janacek Road (Brookfield, WI 53045) as the warehouse where Botello Jr. was making his clothing. This building is also being used by two other businesses owned by Botello Jr. (Midwest Vinyl and Midwest Detailing). Botello Jr. also sells his clothing at a store located in downtown Milwaukee located at 719 N. Milwaukee Street.

**Debrief of CHS #1**

7.     In late May 2022, MASSTF conducted a debrief of a confidential human source, hereafter referred to as CHS #1. CHS #1 stated that CHS #1 knew of subjects identified as Cain M. Botello Sr. and Victoriano Botello Jr. who are cocaine traffickers in the Greater Milwaukee area. CHS #1 stated that Botello Sr. is a large-scale narcotics trafficker who has access to kilograms of cocaine. CHS #1 stated that Botello Sr. and his brother (Victoriano) are both members/associates of the Latin Kings street gang. CHS #1 stated that Botello Sr. and his brother

3

(Victoriano) were the subjects of a long-term drug investigation by the Drug Enforcement Administration (D.E.A.) for dealing kilograms of cocaine. CHS #1 stated that Botello Sr. and Victoriano frequent bars on the south side of Milwaukee (particularly Club Sixth Street – 2101 S. 6th Street and El Infierno Bar – 2000 W. Mitchell Street) where they would deal cocaine. CHS #1 stated that Botello Sr. had a son named Cain M. Botello Jr. CHS #1 stated that Botello Sr. would supply Botello Jr. with cocaine. This information is based personal conversations CHS#1 had with Botello Sr.

8.      Case agents believe CHS #1 is reliable and credible. Since May 2022, CHS #1 has provided information to law enforcement concerning criminal activity in the Milwaukee area. CHS #1's information has been accurate and corroborated, in part, by my knowledge of violent gang members in the Milwaukee area, as well as intelligence gathered from other Milwaukee gang investigations. This intelligence included consensually recorded phone calls, surveillance, and information from other confidential sources. CHS #1 is cooperating with law enforcement for consideration regarding a federal investigation involving narcotics trafficking. CHS #1 is a convicted felon with prior convictions for Theft, Criminal Damage to Property, Criminal Trespass, Armed Robbery, Recklessly Endangering Safety and Carrying Concealed Weapon. For these reasons, case agents believe CHS #1 to be reliable.

## Debrief of CHS #2

9.      I am currently working with a Confidential Human Source, hereafter referred to as CHS #2, who I believe is reliable and credible. Since approximately May 2023, CHS #2 has provided information to law enforcement officers concerning criminal activity in the Milwaukee, WI area.

4

10. Information from CHS #2 has been accurate and corroborated, in part, by my knowledge of violent gang members in the Milwaukee area, as well as intelligence gathered from other Milwaukee gang investigations. This intelligence included controlled narcotics purchases, consensually recorded phone calls, surveillance, and information from other confidential sources. CHS #2 is cooperating with case agents for monetary compensation. CHS #2 is not a convicted felon but has a prior arrest for Aggravated Assault. CHS #2 has conducted at least three controlled buys of narcotics and one controlled buy of a firearm on behalf of case agents. After each of these controlled buys, I met with CHS #2 and CHS #2 made statements about what occurred during the buy. Each time, I then reviewed audio or video footage made by CHS #2 of the transaction and found that it was consistent with CHS #2's statement. For these reasons, I believe CHS #2 is credible and reliable.

11. In July 2023, Milwaukee Police Officer Kyle Veloz and I were approached by CHS #2 who stated that Botello Jr. provided CHS #2 with Botello Jr.'s Telegram channel, which depicted quantities of cocaine and marijuana for sale and distribution.

12. I know through training and experience that Telegram is a globally accessible free cross-platform, encrypted, cloud-based, and centralized instant messaging service. Telegram provides end-to-end encrypted shots, video calling, file sharing, as well as some other features. The draw to using a platform such as Telegram is Telegram does not comply with any warrants or subpoenas. Telegram does not reveal any specific point of contact. In a quote from Telegram, they stated "If telegram receives a court order that confirms you're a terror suspect, we may disclose your IP address and phone number to the relevant authorities. So far, this has never happened. When it does, we will include it in a semiannual transparency report…"

5

## CONTROLLED BUY #1 OF COCAINE

13.     Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CHS, purchases drugs or firearms from a target at the direction of law enforcement. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CHS is used, s/he is searched for contraband, weapons, and money before the operation. The CHS is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the CHS meets case agents at a pre-determined meet location and gives the purchased drugs or firearms and the recording/monitoring equipment to the case agents. The CHS is again searched for contraband, weapons and money then interviewed by the case agents about the drug or firearms transaction. A sample of the suspected drugs is then field tested by the case agents for the presumptive presence of controlled substances and then placed on inventory pursuant to normal inventory procedures. All the calls to the target by the CHS are consensually recorded calls under the direction and control of case agents and made in the presence of case agents.

14.     In late September 2023, my partner PO Kyle Veloz and I met with CHS #2 regarding a controlled buy of drugs from Botello Jr. CHS #2 was going to attempt to purchase an ounce of cocaine.   CHS #2 contacted Botello Jr. via Botello Jr.'s Instagram account (account name "boostedcee") in order to set up the purchase of cocaine from Botello Jr. Botello Jr. instructed CHS #2 to meet near the Guadalajara Restaurant (which case agents knew to be near a residence associated to Botello Jr.).

15.     I conducted an initial search of CHS #2 and did not discover any contraband, money or weapons. I provided CHS #2 with a quantity of pre-recorded buy money and recording

equipment to record the transaction with Botello Jr. Case agents kept CHS #2 under constant visual surveillance from that time that CHS #2 left the pre-determined location until CHS #2 reached the location where CHS #2 was to meet with Botello Jr. CHS #2 made no stops and interacted with no one until case agents observed CHS#2 meet with Botello Jr.

16.     While conducting surveillance in the area of S. 10th Street and W. Walker Street, case agents observed a gray Jeep Grand Cherokee (WI ASF1393) double park in the middle of the street in front of 921 W. Walker Street. Case agents observed an older Hispanic male with long hair in a ponytail wearing glasses exit the driver seat. After this subject exited his vehicle, he entered the gangway between 915 and 921 W. Walker Street. Case agents later identified this subject as Cain Botello Sr. Case agents reviewed online City of Milwaukee tax records for 921 W. Walker Street that listed the residence's owner as "Cain Botello" but did not indicate if it was Botello Sr. or Botello Jr.  Case agents have done regular surveillance at that location over the last 4 months and have regularly observed Botello Sr. at 921 W. Walker Street leading case agents to believe that Botello Sr. resides at that address.

17.     While on surveillance prior to CHS #2's arrival, case agents observed a gray 2022 Honda Pilot (WI ARH8573) parked across the street from 921 W. Walker Street.  After conducting a check through the Wisconsin Department of Transportation, case agents determined that the gray Honda Pilot was registered to Botello Jr.

18.     Case agents later observed Botello Jr. emerge from the alleyway between S. 9th Street and S. 10th Street (which is located near 921 W. Walker Street).   Case agents observed Botello Jr. approach the vehicle being operated by CHS #2.  Case agents observed Botello Jr. enter the front passenger seat. The vehicle being operated by CHS #2 was then observed pulling

7

into the alley behind 921 W. Walker Street. After a short time, case agents observed Botello Jr. exit the front passenger seat and approach the rear gangway off the alley behind 921 W. Walker Street.

19.     Case agents on surveillance in front of the 921 W. Walker Street residence observed Botello Sr. exit the gangway and return to the driver seat of the Jeep Grand Cherokee. This occurred within minutes of Botello Jr. exiting the vehicle operated by CHS #2 after the controlled buy had been completed.

20.     I later met with CHS #2 at a pre-determined location to discuss the controlled buy. At that time, CHS #2 provided me with a clear plastic baggie containing a white chunky substance I suspected to be cocaine. I also recovered the recording equipment from CHS#2. CHS #2 stated that when CHS #2 arrived in the area, Botello Jr. jumped into CHS #2's vehicle and instructed CHS #2 to go into the alley. CHS #2 indicated that CHS #2 handed Botello Jr. the US Currency and, in exchange, Botello Jr. gave CHS #2 a clear plastic sandwich bag that contained the suspected cocaine. CHS #2 stated that after this exchange was made, Botello Jr. exited the vehicle and went back towards the residence.

21.     I conducted a final search of CHS #2 and did not discover any contraband, money, or weapons. Case agents kept CHS #2 under constant visual surveillance from the time that CHS #2 left the controlled buy location until CHS#2 met up with case agents. CHS #2 made no stops and interacted with no one. Case agents identified Botello Jr. as the person who entered CHS#2's vehicle, which is consistent with what CHS#2 told me occurred.

22.    I transported the suspected cocaine to District 2 for testing. While at District 2, I turned over the suspected cocaine to PO Boyd, who later subjected a sample of the suspected cocaine to Nark II 07/33 field tests, which yielded presumptive positive results for cocaine salt and fentanyl. The cocaine/fentanyl weighed approximately 28.3 grams.

23.    Based on my training and experience, I believe that Botello Jr. likely met with Botello Sr. for a short time in the gangway between the addresses of 915 and 921 W. Walker Street prior to Botello Jr. conducting the controlled buy. This would be consistent with Botello Sr. providing cocaine to Botello Jr. to sell to CHS#2.  Based on the location of surveillance, case agents were not able to see any interaction between Botello Sr. and Botello Jr.  However, based on CHS#1's information that Botello Sr. is a source of supply of cocaine for Botello Jr., the fact that Botello Sr. arrived in the area of 921 W. Walker Street moments before Botello Jr. arrived in that same approximately area to conduct the cocaine transaction, and, as detailed below, subsequent phone toll analysis showed that phone numbers associated with Botello Jr. and Botello Sr. were in phone contact during the approximate timeframe of this controlled buy, I believe that Botello Sr. and Botello Jr. were coordinating with each other to effectuate the drug transaction.

**CONTROLLED BUY #2 OF COCAINE**

24.    In late November 2023, I met with CHS #2 regarding a controlled buy of drugs from Botello Jr. CHS #2 was going to attempt to purchase a quantity of cocaine.    Botello Jr. instructed CHS #2 to meet near the corner store located at 1201 S. 33rd Street (El Rincon Grocery Store).

9

25.     CHS #2 stated that CHS #2 contacted Botello Jr. at phone number 414-460-5121 to arrange this cocaine transaction.  CHS #2 indicated that CHS #2 located this number in Botello Jr's Telegram channel. I observed a conversation on CHS #2's phone between Botello Jr. using 414-460-5121 ("Target Cellular Device") and CHS #2 setting up the transaction.

26.     I conducted an initial search of CHS #2 and did not discover any contraband, money, or weapons. I provided CHS #2 with a quantity of pre-recorded buy money and recording equipment to record the transaction with Botello Jr. Case agents kept CHS #2 under constant visual surveillance from that time that CHS #2 left the pre-determined location until CHS #2 reached the location where CHS #2 was to meet with Botello Jr. CHS #2 made no stops and interacted with no one until case agents observed CHS#2 meet with Botello Jr.

27.     CHS#2 advised case agents that CHS#2 was contacted by Botello Jr. while enroute to the pre-determined buy location, and that Botello Jr. stated to CHS #2 that he would be in a white Jeep.

28.     While conducting surveillance in the area of S. 33rd Street and W. Scott Street, case agents observed a white 2024 Jeep Grand Cherokee (WI ARH8573) traveling eastbound on W. Scott Street from S. 34th Street. Case agents later observed this same vehicle park near the area where Botello Jr instructed CHS #2 to meet him. After conducting a check through the Wisconsin Department of Transportation, case agents determined that the white Jeep was registered to Botello Jr.

29.     Prior to CHS #2 arriving at the location, case agents observed a gray Jeep Grand Cherokee (WI ASF1393) parked in front of 921 W. Walker Street, which is the only known vehicle that Botello Sr. operates based on prior instances of case agent surveillance.

30.     Case agents observed CHS#2 operating CHS #2's vehicle and park near Botello Jr.'s white Jeep at the pre-determined buy location.  Case agents observed CHS #2 quickly exit their vehicle and enter the front passenger seat of the white Jeep belonging to Botello Jr.

31.     After a short time, case agents on surveillance observed CHS #2 exit the white Jeep and return to CHS #2's vehicle and leave the location.

32.     While conducting mobile surveillance after the controlled buy had concluded, case agents were able to follow Botello Jr.'s white Jeep to the area where Botello Sr. lives. Case agents followed the white Jeep to the area of S. 15th Street and W. Greenfield Avenue before case agents lost sight of the vehicle due to its extremely reckless driving. Approximately 2 minutes later, case agents again observed the white Jeep traveling westbound in the alley behind the address of 921 W. Walker Street.   Case agents did not see the white Jeep stop in the alleyway due to their surveillance positions and again lost sight of the vehicle until it was observed driving approximately three to four blocks away from the 921 W. Walker Street residence.  However, approximately less than 3 minutes elapsed between when Botello Jr.'s vehicle entered the alleyway behind 921 W. Walker Street and when it was observed less than four blocks away.  This amount of time is more consistent with Botello Jr. making a brief stop in the alleyway rather than driving directly through the alleyway to the area three to four blocks away, as that direct route would have taken less time.  As such, I believe that Botello Jr. likely made a brief stop in the area of Botello Sr.'s residence after the buy.

11

33. Case agents believe that Botello Jr. drove to the alleyway behind 921 W. Walker Street likely to meet with Botello Sr. to provide Botello Sr. with US Currency obtained from the controlled buy. I know from my training and experience individuals that are partnered together in narcotics trafficking often will split the profits made from their sales.

34. I later met with CHS #2 at a pre-determined location to discuss the controlled buy of drugs from Botello Jr. At that time, CHS #2 provided me with two clear plastic sandwich bags containing a white chunky substance I suspected to be cocaine. I also recovered the recording equipment from CHS#2. CHS #2 stated that when CHS #2 arrived in the buy area, CHS #2 exited CHS #2's vehicle and entered the front passenger door of Botello Jr.'s vehicle. CHS #2 stated that when CHS #2 entered the vehicle, Botello Jr. advised CHS #2 that the two plastic sandwich bags that contained suspected cocaine that were inside of the front passenger door handle compartment were for CHS #2. CHS #2 stated CHS#2 then gave Botello Jr. the US Currency. CHS #2 stated that CHS#2 exited Botello Jr.'s vehicle with the narcotics.

35. I conducted a final search of CHS #2 and did not discover any contraband, money, or weapons. Case agents kept CHS #2 under constant visual surveillance from that time that CHS #2 arrived at the buy location prior to the controlled buy until the time that CHS #2 met with case agents to turn over the cocaine. CHS #2 made no stops and interacted with no one other than Botello Jr. in the white Jeep. I reviewed audio recorded by CHS #2 of the cocaine transaction with Botello Jr. and found that it was consistent with CHS #2's statement as to what occurred. I am able to independently identify Botello Jr.'s voice on the recording based upon my review of videos of Botello Jr. posted on social media.

12

36.     I transported the suspected cocaine to District 2 for testing. I later subjected a sample of the cocaine to Nark II 07/33 field tests, which yielded presumptively positive results for cocaine salt and fentanyl. The cocaine/fentanyl weighed over 30 grams.

## PHONE TOLL ANALYSIS

37.     I administratively subpoenaed phone records related to (414) 460-5121 (Target Cellular Device) which I have not yet received, as well as records for the Instagram account associated with Botello Jr. ("boostedcee"). I determined this account was used by Botello Jr. by identifying him via photographs or videos Botello Jr. posted to the account. Said Instagram return of Botello Jr's Instagram account ("boostedcee") showed that Botello Jr. registered his account using the phone number of 414-552-8699.

| Meta Platforms Business Record | Page 2 |
| --- | --- |

**Registration Date Definition**    Registration Date: Date and time of account creation.

**Registration Date**    2015-01-28 07:06:30 UTC

**Registration Ip Definition**    Registration Ip: IP address associated with account creation.

**Registration Ip**    72.128.78.72

**Account End Date Definition**    Account End Date: Displays the status of the account at the time the records were generated.
Account Still Active: Indicates true or false.
Time: Date and time the account was closed.
Reason: The account was closed (deactivated, disabled, deleted).

**Account Closure Date**    **Account Still Active**    true

**Phone Numbers Definition**    Phone numbers: Phone number(s) provided by the account holder. "Verified" indicates the account holder responded to a text sent to the listed phone number.
Unverified: List of "unverified" phone numbers associated with the account.

**Phone Numbers**    +14145528699   Verified

38.     I administratively subpoenaed phone records for 414-552-8699 and analyzed them in an effort to locate additional phone numbers for Botello Jr. and Botello Sr.  While conducting a toll analysis of 414-552-8699, I located phone number 414-366-6544 that was in contact with 414-522-8699 approximately 134 times between July 10, 2023, and October 9, 2023. I conducted a query of a law enforcement database which revealed that 414-366-6544 was registered to Cain M. Botello Sr.  I have personally used this database over 25 times in the past for the purpose of identifying the registered user of a specific phone number and have found that it is accurate and reliable.

39.     I administratively subpoenaed phone records for 414-366-6544.  While conducting toll analysis of 414-366-6544, I observed that phone number 414-544-5424 had contacted 414-366-6544 approximately 232 times between August 13, 2023, and November 13,

14

2023. Additionally, these two numbers were in contact during Controlled Buy 1 over a 5-minute timeframe prior to CHS #2's arrival.

40. A query of the same law enforcement database referenced in paragraph 38 revealed that 414-544-5424 was registered to Botello Jr.

41. I reviewed the administratively subpoenaed phone records for Botello Jr.'s phone number (414-544-5424) and Botello Sr.'s phone number (414-366-6544). In particular, I looked at the pattern of calls between these numbers during controlled buy 1. I do not yet have records related to controlled buy 2. Regarding the first controlled buy, toll data from 414-366-6544 shows that Botello Jr.'s number (414-544-5424) was in contact with Botello Sr.'s number (414-366-6544) just minutes before the controlled buy was completed between Botello Jr and CHS #2 as detailed in paragraphs 13 through 23.

42. I know based upon my training and experience in conducting narcotics investigation that it is common for drug traffickers to be in phone contact with their source of supply immediately before, during, or after a drug sale in order to coordinate acquisition of the drugs to sell and/or to arrange payment for the drugs. Based upon this training and experience, as well as case agent observations made during the first controlled buy, the phone toll analysis, and information from CHS#1 that Botello Sr. is a source of cocaine for Botello Jr., I believe that Botello Sr. and Botello Jr. were in contact during the first controlled buy to coordinate Botello Jr.'s sale of cocaine to CHS#2.

43. I am aware of a separate investigation in which other case agents obtained phone records belonging to a target who sold cocaine to their informant during a controlled buy within

15

the last 30 days. These phone records show that Botello Sr.'s number (414-366-6544) was in contact with the target of that investigation during the timeframe of the controlled buy from that separate target. Within the last 30 days, Officer Andrew Langer personally observed Botello Sr. and the target of that separate investigation together at the El Infierno Bar–which is a location where CHS#1 indicated that Botello Sr. sells cocaine.

44.     Information obtained from this search warrant will be used to attempt to locate Cain Botello Jr., and his frequented locations to identify narcotics and proceed stash locations. Furthermore, the information obtained from this warrant will be utilized to monitor who Botello Jr. contacts in an attempt to identify his drug distribution network and source(s) of supply.

45.     Based on the results from an administrative subpoena, case agents learned that the service provider for telephone number 414-366-6544 is T-Mobile. Based on the results from the police database search, case agents learned that the service provider for telephone number 414-460-5121 is also T-Mobile. The listed subscriber for 414-366-6544 is Cain Botello Sr. and the name associated with 414-460-5121 in the database is "Scot Stein," which I believe to be a fictious name. I am aware from prior investigations that T-Mobile is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

46.     Based on the results from an administrative subpoena, case agents learned that the service provider for telephone number 414-544-5424 is AT&T Mobility. I am aware from prior investigations that AT&T Mobility is headquartered at 11760 US Highway 1, North Palm Beach, FL 33408. As noted above, the listed subscriber for 414-544-5424 is Cain Botello Jr.

16

47.     Case agents are requesting this warrant authorizing the initial collection of data related to the target cellular device for 30 days to further investigate Botello Jr. and Botello Sr.'s activities, and to identify locations to which they travel to further their drug distribution trafficking activities.

48.     Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that Botello Jr. is engaged in the trafficking and distribution of controlled substances and is using the target cellular device while engaged in these crimes. I further submit that probable cause exists to believe that obtaining the location information of the target cellular device will assist case agents in determining Botello Jr.'s criminal activities, to include meeting locations, co-conspirators, and sources of supply.

49.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.

17

Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

50.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the target cellular device. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; and (4) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

51.     I further know that some service providers can collect timing advance or engineering data commonly referred to as, RTT, Timing Advance, LOCDBOR, or equivalent. This engineering data provides a distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate geographic area that is more precise than cell-site data alone.

**E-911 Phase II / GPS Location Data**

52.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information

18

about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the target cellular device, including by initiating a signal to determine the location of the target cellular device on the Service Provider's network or with such other reference points as may be reasonably available.

## Subscriber Information

53.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes

19

under investigation because the information can be used to identify the target cellular device's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST & MANNER OF EXECUTION

54.     I request that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c) and 2711.

55.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), this application and the accompanying warrant are intended to comply with requirements set forth in 18 U.S.C. §§ 3122-3123.

56.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

57.     In my training and experience, I have learned that T-Mobile is a company with its headquarters at 4 Sylvan Way, Parsippany, NJ and provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of cellular devices to which they provide service. That information includes (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, (2) cell-site data, also known as "tower/face information" or cell tower/sector records, and (3) timing advance or engineering data commonly referred to as

20

per call measurement data (RTT, True Call, LDBoR, or equivalent). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

58.     To facilitate execution of this warrant, law enforcement may use an investigative device or devices (sometimes referred to as a Cell Site Simulator or Wi-Fi geolocation device) capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

59.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In

21

order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

60. I request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the target cellular device would seriously jeopardize the ongoing investigation. Such disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is a reasonable necessity for the use of the techniques described. See 18 U.S.C. § 3103a(b)(2). As further specified in the attachment, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or

22

electronic information, there is a reasonable necessity for that seizure. See 18 U.S.C. § 3103a(b)(2).

61. I further request the following information from the service provider: the installation and use of a pen register trap and trace device, all real-time precision location information, including E-911 Phase II data, GPS data, and latitude-longitude data, real time cell site information, and per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) beginning 30 days from the date the warrant is issued.

62. I further request call detail records and data reports (voice, SMS, MMS), including cell site location information, originating and destination IP addresses, per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) for the past 30 days.

63. I further request subscriber and extended subscriber information, handset identifiers, handset make and model, Wi-Fi MAC address, and account notes and memos for the target device.

64. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the target cellular device outside of daytime hours.

65. I further request that the pen register / trap and trace device be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same

dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

66.     I further request that the Court order all documents in support of this application, including the affidavit and search warrant, be sealed until further order by the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. I further request that the Court order any service provider, or their representatives, not to disclose the existence of this warrant or investigation unless ordered to do so by the Court.

67.     A search warrant may not be legally necessary to authorize all of the investigative techniques described. Nevertheless, I submit this warrant application out of an abundance of caution.

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned (414) 460-5121 (referred to herein and in Attachment B as "the Target Cellular Device"), with listed subscriber(s) "Scot Stein," and user Cain Botello Jr., that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

2. The Target Cellular Device.

## ATTACHMENT B

### Particular Things to Be Seized

### from Device Service Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cellular Device for the time period May 1, 2022 to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

26

vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii.  All subscriber and extended subscriber information, handset identifiers, handset make and model, WI-FI MAC address, and account notes and memos pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c).

ix.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

x.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cellular Device, including:

(A)  Call detail records and data reports with cell site location information for voice, SMS, MMS, and data connections, originating and destination IP addresses, and per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) for the past thirty (30) days pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received)

b.  Information associated with each communication to and from the Target Cellular Device for a period of 30 days from the date of this warrant, including:

i.  Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.  Source and destination telephone numbers;

iii.  Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cellular Device.

c. Information about the location of the Target Cellular Device for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cellular Device on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. Information about the target cellular device and its location, later referred to collectively as location information, includes all precision location information, E-911 Phase II data, GPS data, latitude-longitude data, per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent), and real time cell site information for 30 days beginning from the date the warrant was issued. This includes initiating a signal to determine the location of the target cell phone on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government. The information includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the furnishing of information, facilities, technical assistance, and the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C. §§ 3123-3124 by the service provider and the Federal Bureau of Investigation. Because the request for such location data may include use of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) &

28

(4), the application and the warrant are designed to comply with the Pen Register Statute as well as Rule 41.  The application therefore includes all information required for and serves as a pen register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

    iii.   This pen register / trap and trace device shall be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

d.   The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance. Any service provider or representative who gains access to the information in this warrant shall not disclose the existence of the warrant, order, or investigation to any third party unless ordered to do so by the Court. Additionally, the agency requests that all court orders and supporting documents, including the affidavit and search warrant, be sealed until further order by the Court.

e.   This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

29

☐ Original ☐

CLERK'S OFFICE
A TRUE COPY
Nov 29, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Records and information associated with the cellular device assigned number (414) 460-5121 | ) ) ) ) |

Case No. 23 MJ 230

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _12/13/2023_ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. William E. Duffin_____.

*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _11/29/2023 at 10:50 a.m._  *William E. Duffin*

*Judge's signature*

City and state: _Milwaukee, WI_   Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned (414) 460-5121 (referred to herein and in Attachment B as "the Target Cellular Device"), with listed subscriber(s) "Scot Stein," and user Cain Botello Jr., that is in the custody or control of T-Mobile (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered at 4 Sylvan Way, Parsippany NJ, 07054.

2. The Target Cellular Device.

1

**ATTACHMENT B**

**Particular Things to Be Seized**

**from Device Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.    The following subscriber and historical information about the customers or subscribers associated with the Target Cellular Device for the time period May 1, 2022 to present:

        i.    Names (including subscriber names, user names, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.    Local and long distance telephone connection records;

        iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

        vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

2

vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii.  All subscriber and extended subscriber information, handset identifiers, handset make and model, WI-FI MAC address, and account notes and memos pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c).

ix.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

x.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cellular Device, including:

(A)  Call detail records and data reports with cell site location information for voice, SMS, MMS, and data connections, originating and destination IP addresses, and per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent) for the past thirty (30) days pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §2703(c); and

 (ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received)

b.  Information associated with each communication to and from the Target Cellular Device for a period of 30 days from the date of this warrant, including:

i.  Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii.  Source and destination telephone numbers;

iii.  Date, time, and duration of communication; and

3

iv.  All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cellular Device.

c.  Information about the location of the Target Cellular Device for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i.  To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cellular Device on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii.  Information about the target cellular device and its location, later referred to collectively as location information, includes all precision location information, E-911 Phase II data, GPS data, latitude-longitude data, per call measurement or timing advance data (RTT, True Call, LDBoR, or equivalent), and real time cell site information for 30 days beginning from the date the warrant was issued.  This includes initiating a signal to determine the location of the target cell phone on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government. The information includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the furnishing of information, facilities, technical assistance, and the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C. §§ 3123-3124 by the service provider and the Federal Bureau of Investigation. Because the request for such location data may include use

4

of a "pen register" or a "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the application and the warrant are designed to comply with the Pen Register Statute as well as Rule 41. The application therefore includes all information required for and serves as a pen register application, 18 U.S.C. § 3123(a); similarly, the warrant therefore includes all the information required for and serves as a pen register order, 18 U.S.C. § 3123(b).

    iii. This pen register / trap and trace device shall be transferable to any changed dialed number subsequently assigned to a device bearing the same ESN, IMSI, or SIM as the Target Cellular Device; any changed ESN, IMSI, or SIM subsequently assigned the same dialed number as the Target Cellular Device; or any additional changed dialed number, ESN, IMSI, or SIM listed to the same subscriber account as the Target Cellular Device.

d. The government shall compensate the service provider for reasonable expenses incurred in furnishing such facilities or assistance. Any service provider or representative who gains access to the information in this warrant shall not disclose the existence of the warrant, order, or investigation to any third party unless ordered to do so by the Court. Additionally, the agency requests that all court orders and supporting documents, including the affidavit and search warrant, be sealed until further order by the Court.

e. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

5